**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CASE NO. 26-mj-00040** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **GERALD EDDIE BROWN, JR.,** | **:** | |
| **also known as "Runner,"** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S MOTION FOR PRETRIAL DETENTION**

The United States of America, by and through its undersigned counsel, respectfully moves for the pre-trial detention of defendant Gerald Eddie Brown, Jr., pursuant to 18 U.S.C. § 3142(e) and (f), because, if released, there is a serious risk that the Defendant will flee the jurisdiction of this Court.

The Defendant faces serious charges under the Arms Export Control Act ("AECA") that, despite his decades of decorated service as a combat pilot and leader in the U.S. Air Force ("USAF"), he decided to sell his skillset to the highest bidder—in this case, the Chinese air force, know by its formal name, the People's Liberation Army Air Force ("PLAAF"). Specifically, he communicated with several co-conspirators to arrange a contract under which he would make a substantial monthly salary in China in exchange for training PLAAF pilots in a wide variety of skills, including combat tactics, formation takeoff, and air combat maneuvering. Brown acted willfully, fully aware that his actions were against U.S. law. The charges against the Defendant are based on his own messages to a co-conspirator ("Co-Conspirator 1") explicitly describing the planned conspiracy, corroborated by circumstantial evidence, and ultimately confirmed by his own voluntary admissions to law enforcement. Based on these charges and applicable sentencing adjustments, the Defendant likely faces a substantial prison sentence of at least 6-8 years.

1

The Defendant's personal history and characteristics offer little comfort in light of these serious charges and sentencing exposure. Having no real family ties and traveling around the world for work after repeatedly being terminated by various employers, he has almost no ties to any community, let alone ties to the United States that would exert enough influence on him to stay and face these charges. The Defendant's considerable training as a USAF combat pilot, extensive foreign travel, financial means, network of foreign contacts, and association with Chinese intelligence services all enhance the risk of flight. And he has a troubling history of ignoring court orders, giving cold comfort that he would abide by any conditions imposed by this Court. Accordingly, because no combination of conditions will reasonably assure the Defendant's presence at future proceedings, the government respectfully asks that the Court order that he be detained pending trial.

## I.    Procedural Background

Brown was charged by criminal complaint on February 24, 2026, with violating and conspiring to violate the AECA, in violation of 18 U.S.C. § 371 and 22 U.S.C. § 2778. *See* Affidavit in Support of Complaint (Dkt. 1) ("Affidavit"). The defendant was arrested the next day on February 25, 2026, in Jeffersonville, Indiana. *See generally United States v. Brown*, 26-mj-0007-VTW (S.D. Ind.). Brown had his initial appearance the next day, February 26, 2026, before Magistrate Judge Van Willis in the Southern District of Indiana, New Albany Division. At that hearing, the Government moved to detain the Defendant under 18 U.S.C. §§ 3142(f)(1) and (f)(2) as a danger to the community and a risk of flight, after which the court ordered the defendant detained temporarily pending a hearing. Magistrate Judge Willis asked whether Defendant sought a detention hearing within three days in the Southern District of Indiana or in this District upon his arrival. Defendant chose the latter option.

The Defendant was transported to the District of Columbia and had his initial appearance in this district before Magistrate Judge Zia Faruqui on March 17, 2026. Minute Entry (Mar. 17, 2026). At that hearing, the Government proffered that the Defendant posed a serious risk of flight and a serious risk of attempting to obstruct justice. The Court found that the Government had met its initial burden under 18 U.S.C. 3142(f) and set a detention hearing for March 19, 2026, at 11am.

## II.    Factual Background

### a.    The Defendant's Background

The Defendant, a U.S. citizen born in South Carolina, is a decorated former USAF pilot with approximately 24 years of military flight experience. During his USAF career, he commanded sensitive units with responsibility for nuclear weapons air delivery systems, led combat missions, and served as a fighter pilot instructor and simulator instructor on a variety of fighter aircraft. After his USAF career, Defendant worked for approximately 20 years in the civilian aviation sector, where he served as a pilot and then a simulator instructor. Most recently, Defendant served as a contract simulator instructor for the A-10 aircraft at a U.S. air base in South Korea and then as a contract simulator instructor for the F-35 Joint Strike Fighter at a USAF base in Arizona. From in or around December 2023 until in or around January 2026, Defendant worked as a flight instructor in China training Chinese military pilots on fighter aircraft operations. Defendant utilized the call sign "Runner" throughout his military and civilian career as a pilot.

### b.    The Defendant's Conspiracy to Provide Military Training to Chinese Military Pilots in China

As outlined in greater detail in the criminal complaint, from in or around at least September 2023, until in or around February 2026, the Defendant knowingly and willfully conspired with individuals in the United States, China, and elsewhere to violate the AECA, including Co-

Conspirator 1, a dual U.S.-Ecuadorian national, and Su Bin, a Chinese national.[1] The Defendant and his co-conspirators communicated extensively to plan Brown's arrangements to fly to China to provide fighter aircraft training for the PRC military, including pilots in the PLAAF. After his arrival in China, Brown then proceeded to provide this training to the Chinese military. On his first day in China in December 2023, he met with Chinese officials to answer three hours of questions about the USAF. On his second day in China, he presented a brief about his professional career for the PLAAF. Thereafter, he provided additional training and also met regularly with officials from Chinese military intelligence. This training constituted a defense service under the International Traffic In Arms Regulations ("ITAR") and required registration with and a license from the State Department's Directorate of Defense Trade Controls ("DDTC") prior to being provided to foreign persons. At no time did BROWN or any co-conspirator register with DDTC as a provider of defense services or apply for or obtain a license from DDTC to export defense services to the PRC.

### c.   Defendant's Return to the United States in February 2026

On or about February 3, 2026, the Defendant returned to the United States after over two years living in China. Upon his return to the United States, he misrepresented his activities in China during an interview with a Customs and Border Protection officer by claiming that he was engaged only in academic airline instruction, not mentioning fighter aircraft training for the PRC military.[2] Thereafter, Defendant traveled to his residence in Jeffersonville, Indiana, where he was under 24/7 physical surveillance starting on February 4, 2026.

---

[1] As described in detail in the Affidavit, Su Bin pled guilty in 2016 to computer hacking charges related to the theft of military data from U.S. defense contractors. Based on that misconduct, Su Bin was placed on the Commerce Department's Entity List. Su Bin is the owner of the Chinese company Stratos Aviation ("Stratos"), which employed Brown in China and is also on the Entity List.

[2] Brown later stated in his voluntary interview to the FBI that he had, in fact, lied to CBP in this interview.

During the period of surveillance, investigators observed the Defendant on at least one occasion drive a vehicle in a non-linear, erratic manner that was consistent with him conducting a surveillance detection route ("SDR"), a manner of travel in which a person potentially under surveillance uses a route that involves varied timing, routes, pauses, and other techniques to detect potential surveillance.

In addition, on or about February 10, 2026, the Defendant left his residence in Jeffersonville, Indiana with his luggage while driving a rental car, traveled to a bank and exited with a large envelope, and then proceeded to drive on an indirect route through Kentucky and Tennessee to North Carolina. After arriving in the Charlotte, North Carolina area, Brown dropped off his rental car, used a ride-share service to travel to a car dealership, purchased a Mazda Miata convertible with $17,000 in cash, and then drove back Jeffersonville, Indiana overnight, arriving home early the next morning.

### d. FBI Search of the Defendant and his Residence on February 25, 2026

On the morning of February 25, 2026, FBI agents arrested the Defendant at his residence in Jeffersonville, Indiana and executed a court-authorized search of his residence. Pursuant to that search warrant, FBI agents recovered a number of electronic devices and documents.

In a desk in the Defendant's living room, FBI agents found various of his personal effects and documents in a container, including his previous expired U.S. passport and his current U.S. passport. In that same container, FBI agents also found (i) a copy of the personal information page of his current U.S. passport, (ii) what appears to be a fake U.S. passport with a blank personal information page and a footer with the text "P<USA<<<FAKE<ID<GENERATOR<FOR<ANDROID<<<<<<<<," and (iii) two passport-sized pictures of the Defendant. The fake U.S. passport contained various text, images, and

5

formatting consistent with a real U.S. passport, including the letter "P" for a personal passport, the code "USA," and the Passport Number "F09875621." According to FBI investigators, the fake passport is consistent with "novelty" passports available for purchase on the internet. The photographs below depict (1) the copy of his current passport's personal information page, the fake U.S. passport, and the two passport-sized pictures, and (2) a picture of the fake U.S. passport.





6

In a drawer in the same desk, FBI investigators found a large amount of fake currency in U.S. Dollars and Chinese Renminbi. According to FBI investigators, the currency appeared real to the naked eye but is clearly fake when examined more closely because it is labeled as not real currency on the back. The photograph below depicts the fake currency found in the desk at the Defendant's residence.



### e. The Defendant's Voluntary Interviews with the FBI on February 25 and 26, 2026

After his arrest on February 25, 2026, as well as on February 26, 2026, Brown consented to voluntary interviews with FBI agents. During those interviews, the Defendant made various statements regarding his alleged criminal conduct, including acknowledging having provided briefings to the PLAAF and meeting regularly with Chinese intelligence services in China.

### III.   Legal Standard

Under the Bail Reform Act, courts undertake a two-step process to determine whether a defendant should be detained pending trial. First, to determine that a detention hearing is required, "a judicial officer must find one of six circumstances triggering a detention hearing." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (citing 18 U.S.C. 3142(f)). These circumstances are triggered only "in a case that involves" a criminal charge in one of five enumerated categories, including "a crime of violence," 18 U.S.C. § 3142(f)(1)(A), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten a witness or juror, *id.* §§ 3142(f)(2)(A)-(B). *See United States v. Chrestman*, 525 F. Supp. 3d 14, 21 (D.D.C. 2021).

"Second, assuming a hearing is appropriate, the judicial officer must consider several enumerated factors to determine whether conditions short of detention will 'reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Singleton*, 182 F.3d at 9 (citing 18 U.S.C. § 3142(g)). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). These factors include the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. §§ 3142(g)(1)-(4).

"The decision whether to hold a hearing occurs based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *Singleton*, 182 F.3d at 12. When the government seeks to detain a defendant because the defendant is a flight risk, the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v.*

*Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). But the government must establish by clear and convincing evidence that a defendant poses a danger to another person or the community. *See* 18 U.S.C. 3142(f). At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of the community" language in Section 3142 was to be given a broad construction. *See S.* Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("[T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). Courts have, therefore, appropriately construed the statute to find that protection of the community from obstruction of justice is a valid objective of bail conditions. *See, e.g.*, *United States v. Gamble*, No. 19-cr-348 (CKK), 2019 WL 6877755, at *6 (D.D.C. Dec. 17, 2019) ("[O]bstruction of justice does pose a serious danger to the community as contemplated under Section 3142(g)(4)."); *United States v. Zherka*, 592 Fed. App'x 35, 35 (2d Cir. Feb. 5, 2015) ("A serious risk of obstruction of justice may qualify as such a danger to the community.") (citing *United States v. LaFontaine*, 210 F.3d 125, 134–35 (2d Cir. 2000)).

IV.   **Argument**

    a.   **The Defendant Should be Detained Pending Trial Because He Poses a Serious Risk of Flight under 18 U.S.C. § 3142(g)**

In considering whether there are conditions of release that will reasonably assure the safety of any other person and the community and the appearance of the defendant as required, the Court should consider and weigh various factors, including: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and

characteristics. 18 U.S.C. § 3142(g). As set forth more fully below, each of these factors weigh in favor of detaining the defendant.

### i. *The Nature and Circumstances of the Offense Support Pretrial Detention*

As alleged in the Complaint, Brown conspired to violate and violated the AECA by providing prohibited defense services to Chinese military pilots without the required license. Based on those charges—on which the Government expects Brown to be indicted soon—Brown faces a significant sentencing exposure of at least approximately 6-8 years.

Violations of the AECA are covered by U.S.S.G. § 2M5.2(a)(1), which corresponds to a base offense level of 26. Brown's criminal conduct also merits two different role enhancements. First, Brown likely used a "special skill" "in a manner that significantly facilitated the commission nor concealment of the offense," warranting an increase of two offense levels under USSG 3B1.3. Under USSG 3B1.3, Cmt 4, a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing," which "include[s] pilots, lawyers, doctors, accountants, chemists, and demolition experts." Brown provided combat aircraft training based on his decades of experience flying combat aircraft for the USAF. Brown also brought to bear his more recent experience as a simulator instructor pilot for two different defense contractors working for the U.S. military.

Second, Brown likely engaged in obstructive conduct by lying about his time in China to CBP and by communicating with Co-Conspirator 1 about deleting encrypted messaging applications from their phones. As described above, on February 3, 2026, Brown misrepresented his time in China in an interview with CBP, which he later confirmed was, in fact, a false statement. Brown also corresponded with Co-Conspirator 1 about engaging in obstruction. In particular, in his encrypted communications with Co-Conspirator 1, Brown repeatedly emphasized the need to

10

hide their communications and not disclose their misconduct. Later, Co-Conspirator 1 directed Brown to not reply and to "delete me [on Threema] and WeChat also." Thereafter, Brown ceased communication on those encrypted messaging applications with Co-Conspirator 1.

If Brown were to qualify for the zero-point offender reduction under USSG 4C1.1, it would warrant a reduction of two offense levels, which would lead to a likely total offense level of 28. Absent any applicable criminal history, Brown would face a substantial Guidelines range of 78 to 97 months in prison. *See United States v. Languerand*, No. 21-cr-353(JDB), 2021 WL 3674731, at *12 (Aug. 19, 2021) (finding that defendant faced "the possibility of significant jail time" and "a potentially lengthy sentence" based on an estimated guidelines range of 63-78 months).

Further, the crimes the Defendant is alleged to have committed, which are based on U.S. controls on U.S. persons providing "defense services," may be considered "political offenses" by many foreign governments. Such offenses are generally excluded from the list of offenses subject to extradition in extradition treaties to which the United States is a party. Therefore, if the defendant were to flee even to a country with which the United States has an extradition treaty, the charges against the defendant could prevent his extradition.

ii. ***The Weight of the Evidence Against the Defendant Supports Pretrial Detention***

The evidence of the Defendant's participation in a conspiracy to provide defense services is strong. As described in detail in the Affidavit, he engaged in a lengthy series of communications with at least two co-conspirators regarding his agreement to travel to China to work for a company on a contract to train Chinese military pilots associated with the PLAAF. In early October 2023, Brown sent a resume entitled "Instructor Fighter Pilot Resume" to Co-Conspirator 1 to be passed on to Su Bin, which listed Brown's considerable combat flight experience. After Co-Conspirator 1 told Brown that Su Bin was interested in hiring him and wanted to send him to the PLAAF's

11

"fighter weapons school," Brown stated that "[i]t would be awesome" to come to China as a trainer for "the equivalent of 'Red Air' / Adversary Air," which are terms that refer to training exercises that simulate air combat with an enemy air force. After the Defendant had agreed to the offer and began arranging the logistics of his travel to China, on October 31, 2023, he remarked to Co-Conspirator 1 that "I have the chance to fly and instruct fighter pilots again!"

The evidence of the Defendant"s willfulness under the AECA is also strong. As an initial matter, the Defendant is a sophisticated and decorated combat veteran who served in the USAF on active duty from 1983 to 1996 and in a reserve capacity from 1996 until 2007. He received broad and deep training in the USAF and obtained a master's degree in public administration in 1995. More recently, as a contract simulator instructor pilot at Lockheed Martin, the Defendant completed a broad variety of trainings, including a course on "Sensitive Information & International Trade Compliance."

The Defendant's communications with his co-conspirators also demonstrate his willfulness. First, on or about October 2, 2023—at the start of his negotiation regarding his employment in China—Co-Conspirator 1 sent Brown screenshots of an email sent by a USAF representative to another individual regarding a "multinational inquiry" into Stratos's competitor, the Test Flying Academy of South Africa ("TFASA"), into individuals for "providing defense services to the People's Republic of China, specifically the People's Liberation Army (PLA)." The email captured in the screenshot noted that "[g]iven your history of access to your nation's military tactics, techniques, procedures (TTPs), technology, and sensitive data, your active assistance to the PLA through TFASA places you at risk for criminal and civil action." The email further "recommend[ed] severing your connection with TFASA and the PLA," stating that while "[y]our actions to support the PLA to date must be adjudicated," "preventing further damage to the national

12

security of the United States, the NATO alliance, and your professional reputation moving forward is our priority." This screenshot of an email—sent to the Defendant by Co-Conspirator 1—flagged the same theory of criminal liability for which the Defendant was later charged in this case, to wit, the unlicensed provision of defense services to the Chinese military.

Finally, evidencing his consciousness of guilt, throughout his communications with Co-Conspirator 1, the Defendant emphasized the need to maintain secrecy about his upcoming travel to China and work for Su Bin. For example, on October 3, 2023, the Defendant emphasized the need for secure messaging and added that "I think we better keep this quiet." On October 20, 2023, the Defendant wrote that "[i]t is important to keep this off of social media." On October 31, 2023, the Defendant asked if Su Bin was "keeping quiet about me coming," to which Co-Conspirator 1 responded, "[a]bsolutely. Nobody knows." The Defendant added that "I have not said a word or even a hint to anyone." After the Defendant had arrived in China and began providing training to the PLAAF, on January 16, 2024, Co-Conspirator 1 wrote, "Brother. Don't reply. I will contact you soon. Delete me here and WeChat also. We'll talk later."

### iii. *The History and Characteristics of the Defendant Support Pretrial Detention*

The history and characteristics of the defendant also support pretrial detention. In evaluating this factor, the Court should consider the defendant's character, family ties, employment, length of residence in the community, community ties, past conduct, criminal history, and record of court appearances. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The Defendant's history and characteristics demonstrate that he is a flight risk. "The government is required to demonstrate the appropriateness of pretrial detention because the defendant poses a risk of flight 'by a preponderance of the evidence.'" *United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014) (quoting *United States v. Simpkins*, 826 F.2d 94, 96 (D.C.

Cir. 1987)). "That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can 'reasonably' assure that the defendant will appear for trial." *Id*. (quoting *Xulam*, 84 F.3d at 442, citing 18 U.S.C. § 3142(c))).

1.    <u>The Defendant Has Minimal Ties to the United States</u>

The Defendant has minimal ties to the United States and has repeatedly expressed a desire to leave the United States altogether to retire abroad. Simply put: Brown appears to have no meaningful connections to the United States that would keep him here.

Since 2017, Brown has lived an itinerant professional lifestyle across the United States and the world. In 2017, after he was terminated from his position at UPS for a mid-flight altercation with his co-pilot, for which Brown lost his FAA pilot license in September 2018, he went to work for two other cargo airlines as a simulator instructor pilot. In April 2020, faced with the loss of his FAA pilot license, Brown traveled alone to take a position in South Korea at Osan Air Base, a U.S. military facility near the city of Incheon. In or around April 2022, Brown was terminated for creating a hostile work environment based on his sexual harassment of female pilots stationed at Osan. Approximately one week later, Brown accepted a position at Lockheed Martin that required initial training at Luke Air Force Base in Arizona in anticipation of an eventual (but never actually carried out) transfer after which Brown would train U.S. and allied pilots on F-35 joint strike fighter simulators at Amendola Air Base in Italy. Brown never received that security clearance and was not transferred to Italy. Instead, on or about September 15, 2023, Brown was placed on administrative leave based on his failure to obtain a security clearance and given 75 days to obtain a clearance, after which he returned alone to Jeffersonville, Indiana. On November 28, 2023, having still not obtained a security clearance, Brown was terminated by Lockheed Martin.

14

On December 10, 2023, Brown departed the United States alone for China, where for the next approximately 26 months he provided training services for the PLAAF as alleged in the complaint. While in China, Brown traveled twice to both Thailand and South Korea (the second trip to South Korea was part of his return trip to the United States in early 2026). Brown returned to the United States on February 3, 2026, in advance of the Chinese Lunar New Year celebration, a major Chinese holiday during the latter half of February.

After his return to the United States on February 3, 2026, Brown had no contact with any family nor did he appear to have any social engagements. Approximately one day after his arrival, starting on or around February 4, 2026, Brown was subject to 24/7 physical surveillance by the FBI. During the approximately 22-day period between then and his arrest on February 25, 2026, Brown was under surveillance for all but approximately two hours, but not once was he observed visiting someone socially or hosting anyone socially at his condominium.

Brown also did not visit his family, despite that his two children live just a short drive away from Jeffersonville in Louisville, Kentucky. Indeed, at least one of his children had a birthday during the period between his return to the United States and his arrest. In particular, when Brown purchased the Mazda Miata convertible in the Charlotte area for $17,000 cash on February 10, 2026, he told the dealership that the car was for one of his children, but kept the car for himself.

There is good reason for Brown's lack of family contact, however, because open-source checks reveal a 2011 domestic violence complaint by Brown's ex-spouse against him in Jefferson Circuit Court, Family Division in Louisville, Kentucky.[3] As summarized in a 2016 decision of the Kentucky Court of Appeals affirming the Jefferson Circuit Court's final division of assets after

---

[3] *See generally* [*Ex-Spouse*] *v. Gerald E. Brown, Jr.*, No. 11-D-503463-001 (Jefferson Circuit Court, Family Division).

Brown's divorce (in addition to matters related to the custody, supervision, and parenting of his children), Brown and his ex-spouse

> have been appearing on the Court's various dockets since December 2011. In addition to this divorce action, they have a Domestic Violence case in which [ex-spouse] has a Domestic Violence Order against Mr. Brown prohibiting him from having contact [with] her. There are also 2011 Dependency, Neglect, and Abuse (DNA) cases concerning the parties' minor children, related to allegations of domestic violence perpetrated by Mr. Brown against [ex-spouse].[4]

Brown himself acknowledged his lack of family and community ties in his voluntary interviews with the FBI, stating during the first interview that "I don't have a family" and during the second interview that "I don't have friends anymore."

To the extent Brown has had one fixed point in his life for much of the past decade, it is his condominium in Jeffersonville, Indiana. But in text messages with Co-Conspirator 1 on the encrypted messaging application Threema in the fall of 2023, Brown repeatedly emphasized his desire to sell that condominium and retire outside the United States. On October 16, 2023, Brown wrote to Co-Conspirator 1 that he hoped "the program continues for at least 5 years and then I will retire in China or Thailand or Vietnam. All I care about now is going fast again and pulling g's ….. Oh, and gunning you in BFM."[5] On October 20, 2023, Brown noted to Co-Conspirator 1 that "[t]his will be my last job possible." On October 31, 2023, Brown wrote that "I am keeping busy preparing to move, throwing stuff away, selling stuff, and getting my condo ready to sell. I had a meeting today with my real estate agent. I am still waiting for my passport."

---

[4] *See Gerald E. Brown v. [Ex-Spouse]*, No. 2015-CA-000372-MR, at 5 n.4 (Apr. 22, 2016) (Kentucky Court of Appeals) (citing Order of January 27, 2015, *Gerald E. Brown v. [Ex-Spouse]*, Action No. 12-CI-500070 (Jefferson Circuit Court, Kentucky)).

[5] The term "pulling g's" likely refers to experiencing high levels of gravitational force, known as "G-force," which fighter pilots experience while engaging in combat maneuvers, and "BFM" likely refers to "basic fighter maneuvers," a term that describes tactics for close-range aerial combat, which is informally referred to as "dogfighting."

Approximately one month later, on November 28, 2023, Brown wrote again to Co-Conspirator 1 that he had an installation problem with his cabinets, which "has been a very very difficult problem for me here. I worked for many months to coordinate to install new cabinets so I could sell this place—and they messed everything up. Oh well…." Later that same day, Brown emphasized in that same conversation that "I will order more cabinets today and they will get here in 3 months. I will come back here maybe in a year or more to have them installed and then I can sell this place and stay in Asia forever." On December 4, 2023, shortly before his departure from the United States for China, Brown wrote that "I cannot stop thinking about flying again. And living in a great country."

Brown has also emphasized his plan to retire outside the United States in other contexts. For example, in his voluntary interview with the FBI on February 25, 2026, Brown stated that he was looking at "cheap" countries in which to retire, including countries in Southeast Asia and Italy. In addition, in a series of messages on the encrypted messaging application WhatsApp with a USAF officer and pilot stationed in South Korea, Brown discussed his plans in similar terms. For example, on or about October 13, 2025, Brown wrote to that USAF pilot that he was hoping to spent time over the winter in the city of Makati, near Manila, Philippines, and added that "I want to fucking retire soon." In December 27, 2025, Brown wrote to that USAF pilot again that he was "bouncing around Asia, Hong Kong for the holidays." Brown added that his "[t]entative plan is to bounce into Korea in February," then "[n]o LBFM[6] in tow, solo trip home to chill. No plans beyond that."

Consistent with his desire to carry out these improvements and sell his condominium, since his return to the United States in February 2026, Brown was observed by FBI surveillance on

---

[6] Based on open-source information, this appears to be a derogatory acronym for a sexual partner.

17

multiple occasions traveling to and from several home improvement stores while carrying home improvement materials.

In total, all of these aspects of Brown's personal life paint a clear picture of a man untethered to any fixed place and with no apparent strong family or social ties to anywhere—let alone the United States. This fact weighs strongly in favor of finding that Brown poses a serious risk of flight who should be detained pending trial.

2.    <u>The Defendant's Skills, Assets, and Relationships Exacerbate his Serious Risk of Flight</u>

Brown has a variety of skills, assets, and relationships that would enable him to flee the Court's jurisdiction if he were released. As described above, Brown is a savvy traveler with experience traveling to countries around the world. While living in China since late 2023, Brown traveled twice to both Thailand and South Korea. Brown lived in South Korea between 2020 and 2022. As a UPS pilot between 2005 and 2017, Brown flew to China more than 30 times in the course of his work. Before that, Brown traveled widely as part of the USAF, including to multiple U.S. military facilities overseas.

Brown is a skilled pilot with the ability to fly a variety of aircraft, including combat aircraft, civilian airline and cargo aircraft, and other civilian aircraft. In addition, as part of his career in the USAF, Brown received a variety of trainings regarding operating in non-permissive environments. In particular, in February 1984 at the beginning of his USAF career, Brown undertook the USAF Basic Survival Training Course and Water Survival Training Course, which teach USAF pilots skills needed to survive in hostile environments, including behind enemy lines.

Brown also appears to have significant assets, including assets overseas. He receives a pension from his USAF career. While he was in China, he appears to have made an annual salary of at least approximately $250,000. In particular, in a message to Co-Conspirator 1 on October 20,

2023, the Defendant noted that the offer he received was for "18,000 a month plus 15,000 for relocation." Later that same day, the Defendant wrote again to Co-Conspirator 1 that he had spoken to Su Bin "and he added a little to my salary." For calendar year 2024, Brown had two foreign bank accounts—an account at the Industrial and Commercial Bank of China that had up to $200,000 in it during 2024, as well as an account at Bangkok Bank in Thailand that had a minimal balance during that period. Consistent with having access to considerable liquid assets, after he returned to the United States last month, on February 10, 2026, Brown drove from Jeffersonville, Indiana to Charlotte, North Carolina to purchase a Mazda Miata convertible for $17,000 in cash. Based on the above, Brown would have access to considerable assets if, consistent with his stated plan, he retired in China or another location in east Asia.

Brown's relationships formed in the course of his work for the Chinese military would also facilitate him traveling and living outside the United States. While in China, Brown worked on a contract for the PLAAF, during which he had regular contact with members of the Chinese military. This contact spanned more than two years and multiple locations in China. While serving as a trainer for the Chinese military, Brown also came into close contact with former personnel from various other countries, several of whom are co-conspirators in Brown's criminal conduct.

Moreover, based on his own admissions, Brown has had significant interaction with Chinese intelligence services, including holding approximately 15-20 regular meetings during his over two years in China. Brown characterized his primary interlocutor, Su Bin, as a "master spy." In addition, Brown admitted to the FBI that in 2024, after his return to China from South Korea, Brown met with Chinese intelligence and they put software on his computer to download "everything."

Brown has the ability and means to travel to a wide variety of locations, potentially with the help of a foreign intelligence service with significant incentive to assist him with evading prosecution. These aspects of Brown's personal characteristics and circumstances support finding that he poses a serious risk of flight.

### b. No Combination of Conditions Can Reasonably Ensure Brown's Appearance at Court Proceedings

In light of Brown's serious risk of flight, the next inquiry is whether any combination of conditions can be imposed that would reasonably ensure Brown would appear at future court proceedings. None can. Even GPS monitoring would be relatively straightforward to circumvent for Brown, who has a history of prior non-compliance with court orders and essentially nothing tying him to the United States.

As an initial matter, Brown's history of violating court orders should weigh strongly against any conditions that require Brown's voluntary compliance to be effective. In the 2016 decision by the Kentucky Court of Appeals affirming the dissolution of Brown's marriage, the appellate court noted that the family court in 2015 had found that Brown had "been held in contempt twice for violating no contact Orders regarding [Ex-Spouse] and the children in the Domestic Violence and [Dependency, Neglect, and Abuse] cases."[7] The family court described Brown's conduct in those proceedings as "obstructive and dilatory"[8] and further noted that on the eve of trial, Brown's attorney (his seventh attorney in that litigation) had "informed the Court that she had an ethical conflict in her representation of Mr. Brown" because "she received information that revealed to her discrepancies in the information she had been provided up to that point" by

---

[7] *See Gerald E. Brown v.* [*Ex-Spouse*], No. 2015-CA-000372-MR, at 6 (Apr. 22, 2016) (Kentucky Court of Appeals) (citing Order of Jan. 27, 2015, *Gerald E. Brown v.* [*Ex-Spouse*], Action No. 12-CI-500070 (Jefferson Circuit Court, Kentucky)).

[8] *Id.* at 7 (citing Order of Feb. 26, 2015, *Gerald E. Brown v.* [*Ex-Spouse*], Action No. 12-CI-500070 (Jefferson Circuit Court, Kentucky)).

Brown, her client.[9] While that litigation was a decade ago in a different context, the demands on Brown's behavior then were similar to the conditions this Court would likely impose on Brown if he were released pending trial: respect court orders and tell the truth. The Government respectfully submits that Brown's failure to follow those instructions in that case should undermine any confidence this Court might have in Brown's ability to abide by any release conditions it might impose. Here, the conditions the Court would likely impose are, at bottom, "behavioral prohibitions [that] are essentially unenforceable promises to not engage in behavior that might facilitate the defendant's flight from this jurisdiction or from the United States and, standing alone, provide no assurance that [the defendant] will remain here for trial." *United States v. Anderson*, 384 F. Supp. 2d 32, 41 (D.D.C. 2005).

Indeed, even the strongest monitoring that the Court could impose—home confinement with GPS monitoring—would have limited utility in preventing Brown from fleeing. Supervisees on GPS monitoring are not subjected to around-the-clock, real-time monitoring by their supervising officer. Moreover, warrants are not issued moments after a defendant leaves their designated area. For example, if a supervisee were to violate the terms of his release by leaving his prescribed area on a Friday at 6:00 p.m., practically speaking, a warrant might not issue until sometime on Monday, giving a minimum of 2 ½ days to abscond.  Were Brown to take advantage of this time delay, he could easily cross the border into Canada, and out of this Court's jurisdiction. *See, e.g.*, *United States v. Lorenzana-Cordon*, No. 03-cr-331-13 (CKK), 2015 WL 5011445, at *4 (D.D.C. Aug 24, 2015) ("Although electronic monitoring is a method for monitoring a defendant's whereabouts, it does not prevent a defendant from absconding.").

---

[9] *Id.* at 4 (citing Order of Jan. 27, 2015, *Gerald E. Brown v.* [*Ex-Spouse*], Action No. 12-CI-500070 (Jefferson Circuit Court, Kentucky)).

Moreover, Brown would not even need to travel to Canada or another foreign country to escape the Court's jurisdiction—he could simply go to a consular facility in the Washington, DC area. Were Brown released and allowed to reside in Jeffersonville, Indiana in the Southern District of Indiana, he would still be a modest drive from the Chinese consulate in Chicago. (Notably, Brown obtained his initial Chinese visa there in December 2023). Based on the doctrines of inviolability and diplomatic immunity, U.S. law enforcement may not enter foreign consulates and embassies, nor the residences and automobiles of diplomats, outside of narrow public safety exceptions. From a practical standpoint, the defendant could enter any diplomatic vehicle belonging to any diplomat, any consulate, or any embassy and remain outside the reach of this Court indefinitely. Further, should Brown enter and remain in a diplomatic vehicle, U.S. law enforcement would be powerless to stop that vehicle from driving outside the United States, and beyond the reach of the Court, with Brown inside.

And here, the risk that Brown could leverage a foreign government to evade this Court's jurisdiction is far from a mere theoretical concern. Brown spent more than two years closely associated with the PLAAF and met regularly with Chinese intelligence services in China. Brown may seek their protection—either through flight from the United States or refuge in an embassy— in order to avoid this prosecution. While the idea that Brown would attempt to drive north to Canada or abscond to a foreign embassy in the Washington, DC area may seem far-fetched, as described above, Brown is facing a lengthy prison sentence with practically nothing anchoring himself to this country and a repeatedly expressed desire to retire abroad. These factors all weigh strongly in support of detaining the Defendant pending trial.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Defendant should be detained pending trial under 18 U.S.C. § 3142(g).

Respectfully submitted,


Dated: March 19, 2026                   By:   JOHN A. EISENBERG
                                              ASSISTANT ATTORNEY GENERAL

                                              */s/ Beau Barnes*_____
                                              Beau D. Barnes
                                              Trial Attorney
                                              D.C. Bar No. 1024150
                                              Counterintelligence & Export Control Section
                                              National Security Division
                                              950 Pennsylvania Avenue NW
                                              Washington, D.C. 20530
                                              Phone: (202) 305-4679
                                              Beaudre.Barnes@usdoj.gov


                                              JEANINE FERRIS PIRRO
                                              UNITED STATES ATTORNEY

                                              Steven B. Wasserman
                                              Assistant United States Attorney
                                              D.C. Bar No. 453251
                                              National Security Section
                                              United States Attorney's Office
                                              601 D Street, N.W.
                                              Washington, D.C. 20579
                                              Phone: (202) 252-7719
                                              Steven.Wasserman@usdoj.gov