**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CASE NO. 26-mj-00040** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **GERALD EDDIE BROWN, JR.,** | **:** | |
| also known as "Runner," | **:** | |
| | **:** | |
| Defendant. | **:** | |

**GOVERNMENT'S MOTION FOR REVIEW OF RELEASE ORDER**

The United States of America, by and through its undersigned counsel, seeks this Court's review of the release order by the Honorable Zia M. Faruqui, United States Magistrate Judge for the District of Columbia, issued at the conclusion of the detention hearing for defendant Gerald Eddie Brown, Jr. (the "Defendant") on March 23, 2026. The Government respectfully requests that the Court overrule the Magistrate Judge's denial of the Government's motion for pretrial detention based on this Court's authority under 18 U.S.C. § 3145(a)(1) and find that Defendant presents a serious risk of flight under 18 U.S.C. § 3142(g).

As described in detail in the Government's Motion for Pretrial Detention, *see* Dkt. 10, the Defendant faces serious charges in this case under the Arms Export Control Act ("AECA") that he knowingly and willfully provided defense services in the form of military training to the Chinese air force, known by its formal name, the People's Liberation Army Air Force ("PLAAF"). The charges against the Defendant are based largely on his own communications in furtherance of the conspiracy and corroborated by his subsequent voluntary statements to law enforcement. Based on these charges, the Defendant likely faces a substantial prison sentence of at least 6-8 years.

In light of the strong incentive to flee presented by the serious charges he faces, the Defendant's personal history and characteristics offer little comfort that he will not flee. While the

1

Defendant has family members in the United States, these proceedings have made clear that he has had no meaningful connection to his family for many years and they represent little—if any—ties to this country. In presenting the Defendant's older sister as a proposed third-party custodian for home detention, she noted that she was unaware that the Defendant had moved to the People's Republic of China ("China" or the "PRC") for over two years until she learned of his arrest from a third party and that she had not seen the Defendant in person for at least 8-9 years. Not only would the custodian arrangement be insufficient, but these facts themselves underscore yet again that the Defendant has no meaningful ties to this country. Indeed, the Defendant has led an itinerant lifestyle over the past decade, living by himself in different locations in the United States and in Italy, South Korea, and, most recently, in China. In repeated statements over years, Defendant has stated that he intends to retire overseas. And on top of Defendant's lack of any real anchor to the United States and extensive foreign travel, the Government has proffered significant evidence of his overseas financial and domestic financial assets, network of foreign contacts, link with Chinese intelligence services, recent false statements to U.S. authorities, and prior history of ignoring court orders. Taken together, these facts strongly support finding that Defendant poses a serious risk of flight.

In addition to the evidence previously proffered by the Government, recent investigative developments have revealed additional evidence supporting that Defendant poses a serious risk of flight. In particular, in a recent interview with the FBI, a former pilot in the Royal Moroccan Air Force who had worked in China with Defendant provided additional information about Defendant's training activity for the PLAAF. Most relevant here, the Moroccan pilot stated that he observed the Defendant in or around August 2024 tell co-conspirator Su Bin that his pay was

insufficient if he was going to work for him "like this" and that Defendant knew that he would not be able to return to the United States after his work in China.

In light of the serious flight risk posed by Defendant—underscored by this additional investigative development—there is no combination of release conditions that would reasonably assure the Defendant's presence at future court proceedings. Accordingly, the Government respectfully requests that the Court overrule Magistrate Judge Faruqui's release order and order that the Defendant be detained pending trial.

## I.       **Procedural Background**

Brown was charged by criminal complaint on February 24, 2026, with violating and conspiring to violate the AECA, in violation of 18 U.S.C. § 371 and 22 U.S.C. § 2778. *See* Affidavit in Support of Complaint (Dkt. 1) ("Affidavit"). The defendant was arrested the next day on February 25, 2026, in Jeffersonville, Indiana. *See generally United States v. Brown*, 26-mj-0007-VTW (S.D. Ind.). Brown had his initial appearance the next day, February 26, 2026, before Magistrate Judge Van Willis in the Southern District of Indiana, New Albany Division. At that hearing, the Government moved to detain the Defendant under 18 U.S.C. §§ 3142(f)(1) and (f)(2) as a danger to the community and a risk of flight, after which the court ordered the defendant detained temporarily pending a hearing. Magistrate Judge Willis asked whether Defendant sought a detention hearing within three days in the Southern District of Indiana or in this District upon his arrival. Defendant chose the latter option.

The Defendant was transported to the District of Columbia and had his initial appearance in this district before Magistrate Judge Zia Faruqui on March 17, 2026. Minute Entry (Mar. 17, 2026). At that hearing, the Government proffered that the Defendant posed a serious risk of flight and a serious risk of attempting to obstruct justice. The Court found that the Government had met

its initial burden under 18 U.S.C. 3142(f) and set a detention hearing for March 19, 2026, at 11am. In advance of the hearing on March 19, the Government filed a memorandum in support of its request for the Defendant's pretrial detention. Dkt. 10. At the hearing on March 19, the defense requested a continuance and the Court continued the hearing to March 23, 2026, at 1:30pm. The Defendant filed an opposition the morning of March 23. Dkt 11. At the detention hearing before Magistrate Judge Faruqui on March 23, the court heard evidence by proffer from the Government and defense consistent with the parties' written submissions. In addition, the Defendant's proposed third-party custodian, his older sister Terry Brown (hereinafter, "Ms. Brown"), appeared remotely and answered questions from the Court and the Government.

At the detention hearing on March 23, Magistrate Judge Faruqui's questions to the proposed custodian focused on the circumstances of her residence in Minneapolis, her employment, and her understanding of the responsibilities she would assume if the Court were to appoint her as Defendant's custodian while he was under home detention at her residence. In response to the Government's questions, and contrary to the defendant's claim of close familial ties in the United States, Ms. Brown stated that (1) she had not been aware that Defendant was in China for the previous two years until she learned through a third party of the Defendant's arrest, (2) she had not seen the Defendant in person since a prior occasion years ago while he worked for UPS (a position from which Defendant was terminated over eight years ago in September 2017), and (3) she had not spoken to Defendant after his return to the United States prior to his arrest.[1]

At the conclusion of the hearing, over the Government's objection, Magistrate Judge Faruqui found that certain conditions could reasonably assure Defendant's appearance at court proceedings, including ordering Defendant to stay on 24/7 home detention at the residence of his

---

[1] This summary is based on the recollection of undersigned Government counsel. The Government has not yet received the transcript of the March 23 detention hearing.

sister in Minneapolis and various other conditions. *See* Dkt. 13. The Government indicated that it intended to appeal Magistrate Judge Faruqui's order and moved for a temporary stay of the release order, after which Magistrate Judge Faruqui stayed the release order until March 17, 2026, at 5pm and ordered the Government to file its motion for review no later than March 24, 2026, at 5pm.

## II.    Factual Background

The Government incorporates by reference its prior detention memorandum filed on March 19, 2026, *see* Dkt. 10, but provides additional factual background below based on recent investigative developments.

As described above, in a recent interview with the FBI, a former pilot in the Royal Moroccan Air Force who had worked in China with Defendant provided additional information about Defendant's training activity for the PLAAF. Among other details, the Moroccan pilot stated that he had observed Defendant provide training for the PLAAF at a military conference in Bejing in or around July or August 2024 on the structure of the U.S. Air Force, the history of electronic warfare, and the F-35 platform of the U.S. Air Force ("USAF"). The Moroccan pilot stated that he observed the Defendant around that same time tell co-conspirator Su Bin that his pay was insufficient if he was going to work for him "like this." Finally, the Moroccan pilot also stated that Defendant was aware that working for Su Bin was "a big deal" and that Defendant knew that he would not be able to return to the United States after his work in China.

## III.    Legal Standard

Under the Bail Reform Act, courts undertake a two-step process to determine whether a defendant should be detained pending trial. First, to determine that a detention hearing is required, "a judicial officer must find one of six circumstances triggering a detention hearing." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (citing 18 U.S.C. 3142(f)). These circumstances are

triggered only "in a case that involves" a criminal charge in one of five enumerated categories, including "a crime of violence," 18 U.S.C. § 3142(f)(1)(A), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten a witness or juror, *id.* §§ 3142(f)(2)(A)-(B). *See United States v. Chrestman*, 525 F. Supp. 3d 14, 21 (D.D.C. 2021).

"Second, assuming a hearing is appropriate, the judicial officer must consider several enumerated factors to determine whether conditions short of detention will 'reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Singleton*, 182 F.3d at 9 (citing 18 U.S.C. § 3142(g)). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). These factors include the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. §§ 3142(g)(1)-(4).

"The decision whether to hold a hearing occurs based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *Singleton*, 182 F.3d at 12. When the government seeks to detain a defendant because the defendant is a flight risk, the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). But the government must establish by clear and convincing evidence that a defendant poses a danger to another person or the community. *See* 18 U.S.C. 3142(f). At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

Pursuant to 18 U.S.C. § 3145(a)(1), the government "may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release," and "the motion shall be determined promptly." When reviewing the prior decision of a Magistrate Judge, "[t]he Court applies *de novo* review to the question and is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *United States v. Nava*, Nos. 23-cr-73-4, 25-cr-73-6 (CKK), 2023 WL 3158987, at *3 (D.D.C. Apr. 28, 2023) (citation and quotation marks omitted).

## IV.   Argument

The Defendant presents a serious risk of flight because he faces a significant sentence based on charges supported by strong evidence and he has a unique ability to flee this country and evade prosecution. In light of those incentives and abilities, no combination of conditions the Court could impose can reasonably assure that he appears in court. Simply put: even the most stringent release conditions cannot prevent Defendant from acting on the strong incentives he faces by walking out the door where he is held in home confinement, getting access to a vehicle, and driving to an international border or consular facility to evade the Court's jurisdiction. The Government incorporates by reference its prior detention memorandum, *see* Dkt. 10, but responds here to certain arguments made by the Defendant in his written opposition, *see* Dkt. 11, and at the March 23 detention hearing.

### a.   The Defendant Has Almost No Current Meaningful Ties to The United States

The Defendant argues that he has "substantial ties to the United States" because of his "decade of military service" and "familial ties" to this country. Dkt. 11 at 4-5. Neither contention stands up to scrutiny. First, while Defendant did serve his country and ended his USAF career as

7

a decorated combat veteran, it is a stretch to say that his prior military service supports an argument that he has ties to this country when he is charged with providing training in combat tactics to the PLAAF. The PRC occupies an adversarial position to the United States and, if ever, the skills he provided to the PLAAF would most likely be used against U.S. allies or U.S. military forces themselves. As an experienced fighter pilot and contractor who has spent over four years since 2020 in East Asia, the Defendant would have been well aware of this fact. Indeed, the November 2025 "National Security Strategy of the United States of America" reaffirmed longstanding U.S. strategy that "deterring a conflict over Taiwan, ideally by preserving military overmatch, is a priority," that the United States "will build a military capable of denying aggression anywhere in the First Island Chain" (a term for the island chain that includes Japan and Taiwan), and that a "security challenge is the potential for any competitor to control the South China Sea."[2] Each of these challenges stems from the increasing military threat posed by the PRC.

Second, Defendant emphasizes his strong family ties and "robust support system in the United States." Dkt. 11 at 4. The Government has already described Defendant's minimal family ties in detail, including his time spent away from any family, his repeated desire to retire in Asia, and his statements to the FBI about his lack of any family. But the March 23 detention hearing laid bare that these family ties are threadbare at best. While Defendant offered his older sister as a proposed third-party custodian and noted her concern for Defendant's wellbeing, Ms. Brown disclosed details underscoring her lack of a meaningful relationship with the Defendant. In particular, she stated that she had not been aware that Defendant had been in China until she learned of his recent arrest through a third party and that she had not seen Defendant in person since he flew through Minneapolis at some point while he was working for UPS. In other words,

---

[2] Nat'l Security Strategy of the United States of America," at 23-24 (Nov. 2025), https://www.whitehouse.gov/wp-content/uploads/2025/12/2025-National-Security-Strategy.pdf.

the sibling with whom Defendant purports to have close ties was not aware that he had moved to a foreign country for several years and has not seen him in person for at least approximately 8-9 years. Defendant's relationship to his sister does not represent a meaningful connection to her or to this country.

b. **The Defendant's Ties to China Support His Incentive and Ability to Flee**

The Defendant emphasizes that "ties to foreign countries do not mean someone is a serious flight risk." Dkt. 11 at 6. That is correct on its face, but a defendant's foreign ties are a relevant factor in a court's assessment of whether a defendant is a flight risk. In particular, the strength of a defendant's ties to a foreign country can "demonstrate [his] ability 'not only to flee . . . the United States . . . but also to live comfortably and evade capture in foreign jurisdictions.'" *United States v. Hong Vo*, 978 F. Supp. 41, 46-47 (D.D.C. 2013) (finding that defendant's "access to substantial assets overseas, combined with her experience living in Vietnam for the past two years, her language skills, and her contacts in Vietnam" "favor pretrial detention") (quoting *United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005)). In addition, as underscored by the FBI's recent interview with a former pilot in the Royal Moroccan Air Force, the Defendant acted as part of the charged criminal conspiracy knowing full well that he might not be able to return to the United States after his work in China. Accordingly, Defendant's ties to foreign countries—including China, Thailand, and South Korea, among other places—are strong and similarly support pretrial detention.

In his opposition, Defendant notes several examples of "defendants in this jurisdiction with substantial foreign ties who have been released pretrial in recent years." But these examples do not support Defendant's argument. In *United States v. Varkey*, 19-cr-425 (DLF) (D.D.C.), the defense here argues that defendant Varkey was "permitted to live in Philadelphia with a friend"

despite having "no real ties to [the] United States." Dkt. 11 at 6. In that case, however, defendant Varkey's own sentencing memorandum noted that he had been arrested on an Interpol warrant in Kuwait and released for two years during extradition proceedings, after which he voluntarily traveled to the United States at Interpol's direction to face charges. *See* Defendant's Sentencing Memorandum, Dkt. 61, at 8-9 (Nov. 6, 2023). Defendant Varkey faced a potential Guidelines range of 18-24 months. *Id.* at 1. Similarly, in *United States v. Nader*, 24-cr-357 (JMC) (D.D.C.), the defense notes that defendant Nader was "permitted to live in Los Angeles with his wife, who is Iranian." Dkt. 11 at 6. But defendant Nader was a naturalized U.S. citizen who had been living in the United States for years prior to his arrest and he had close family ties to the United States (including his wife). Finally, in *United States v. Naqvi, et al.*, 20-cr-181 (CRC) (D.D.C.), the defense noted that both defendants "had strong family ties to Pakistan" but were released on home detention. While both defendants did have such ties, defendant Naqvi in particular had deep ties to Houston, including close family and three young children. Moreover, defendant Naqvi received a time-served sentence of 7 days, while defendant Zaidi received a time-served sentence of 14 days. *See* Minute Entry for Sentencing (Aug. 13, 2024) (Zaidi); Minute Entry for Sentencing (Oct. 1, 2024) (Naqvi). Each of these cases contrasts starkly with this case based on the Defendant's lack of any meaningful ties to this country and the significant sentence he faces.

**c. The Substantial Sentence Defendant Faces Increases His Risk of Flight**

The Defendant argues that the nature and circumstances of the offense favor his pretrial release because he likely only faces a probationary sentence but, in the alternative, also argues that a lengthy Guidelines range "would provide *more* incentive for Mr. Brown to comply with his conditions on release, not less." Dkt, 11 at 8. These arguments are both wrong. First, under 2M5.2(a)(1), Defendant faces a base offense level of 26 for the exportation of "military services."

This base offense level is enhanced by two levels for his obstructive conduct under USSG 3C1.1 for communicating with a co-conspirator about deleting his encrypted communications applications and for lying to U.S. authorities about his criminal conduct, and increased by a further two levels based on his use of a "special skill" under USSG 3B1.3. Ultimately, Defendant likely faces a sentence of 78-97 months.

Second, the Defendant's suggestion that a higher sentencing exposure *supports* his argument's logic falls under its own weight. As courts have held repeatedly, when facing a more severe sentence, a defendant has more incentive to flee. *See, e.g.*, Order, *United States v. Ghorbani*, No. 18-cr-00255-PLF (Dkt. 26), at 12 (D.D.C. Sept. 5, 2018) (finding that defendant faced "significant penalties" based on a Guidelines range of 63-78 months for criminal sanctions charges under the International Emergency Economic Powers Act, which "makes it more likely that [he] would attempt to flee prosecution") (quoting *United States v. Amar*, 300 F. Supp. 287, 289 (D.D.C. 2018)). Defendant cannot have it both ways.

### d.   The Defendant's Proposed Home Detention With A Custodian is Inadequate

Based on the Defendant's serious risk of flight, Magistrate Judge Faruqui's release order included a condition that Defendant be required to stay 24/7 in home detention under the care of his older sister as a third-party custodian at her home in Minneapolis. This arrangement is insufficient to allay any of the concerns with respect to Defendant's serious risk of flight. In particular, none of the proposed conditions of release—including the good faith efforts of his older sister as custodian—would prevent the Defendant from acting on the strong incentives he has to flee. As described above, the record before the Court establishes that the Defendant and his sister are "not close," which weighs strongly in favor of finding that her role as a custodian would not reasonably assure his appearance at trial. *See Hong Vo*, 978 F. Supp. 2d at 46-47; *see also United*

*States v. Tajideen*, No. 17-cr-46 (RBW), 2018 WL 1342475, at *7 (D.D.C Mar. 15, 2018) ("[T]he Court is not persuaded that the potential consequences [third-party custodian security company] theorizes it would suffer if the defendant escaped its custody [are] sufficient to ensure the defendant's presence at further court proceedings."); *United States v. Harry*, No. 19-cr-246-MCA-AME, 2021 WL 3076905 at *4 (D.N.J. July 21, 2021) (rejecting property posted by third party because it does not "provide sufficient moral suasion over Defendant to secure his appearance at future proceedings in this case") (citation omitted).

Defendant has the ability to flee. Despite representing to the court certain health conditions, which are largely unsubstantiated, recent history confirms Defendant is more than capable of walking out of his sister's residence and driving a vehicle to the Canadian border. As a relevant example, on February 10, 2026, Defendant was observed by FBI surveillance driving over a thousand miles in a 24-hour period after leaving his home in Jeffersonville, Indiana to drive to Charlotte, North Carolina in a rental car, after which he purchased a car with $17,000 cash. Even if the Defendant's sister were to install security cameras and notify Pretrial Services immediately upon observing the Defendant flee, it would not prevent him from fleeing.

While the Government strenuously maintains its position that there is no combination of conditions that can reasonably assure Defendant appears for future proceedings, if the Court denies the Government's request to overturn the Magistrate Judge's release order, the Government respectfully requests that the Court impose a bond requirement on both Defendant and his proposed custodian. In particular, the Defendant has stated repeatedly that his primary motivation in China was to earn money, so it is reasonable for him to be required to put his assets up for bond should he flee the court's jurisdiction. While the Government continues to evaluate the Defendant's complex financial situation, as one relevant data point, Defendant purchased a red

convertible for $17,000 in cash on February 10, 2026. Similarly, the Government believes it is also appropriate for Defendant's custodian, Ms. Brown, to also offer certain property as bond in her potential role as the Defendant's third-party custodian.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court overrule the Magistrate Judge's release order under 18 U.S.C. § 3145(a)(1).

Respectfully submitted,

Dated: March 24, 2026        By:   JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL

*/s/ Beau Barnes*
Beau D. Barnes
Trial Attorney
D.C. Bar No. 1024150
Counterintelligence & Export Control Section
National Security Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 305-4679
Beaudre.Barnes@usdoj.gov

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Steven B. Wasserman
Assistant United States Attorney
D.C. Bar No. 453251
National Security Section
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20579
Phone: (202) 252-7719
Steven.Wasserman@usdoj.gov

13